16-1754-cr
*United States v. Roberto Pabon*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2016

(Argued: April 28, 2017      Decided: September 11, 2017)

No. 16-1754-cr

_____

UNITED STATES OF AMERICA

*Appellee,*

-v.-

ROBERTO PABON,
AKA ROBERTO COJA, AKA T-COJA PABON,
AKA T-HEART PABON, AKA CONJA PABON,
AKA T-DEVIL PABON,

*Defendant-Appellant.*

_____

Before:      CABRANES, LIVINGSTON, *Circuit Judges*, and PAULEY, *District Judge.*[*]

On this appeal from a judgment of conviction and sentence entered May 19, 2016, in the United States District Court for the District Court of Vermont (Murtha, *J.*), defendant-appellant Roberto Pabon challenges the district court's

---

[*] Judge William H. Pauley III, of the United States District Court for the Southern District of New York, sitting by designation.

denial of his motion to suppress physical evidence that he had body-packed narcotics into Vermont. Pabon contends that suppression is warranted because the state police violated his Fourth Amendment rights when they failed to release him after x-rays taken pursuant to a search warrant did not reveal evidence that he was body-packing. Pabon also argues that suppression is warranted because the state police failed to bring him before a state court judge for a probable cause determination in a timely fashion in violation of *Gerstein v. Pugh*, 420 U.S. 103 (1975), and *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991). We disagree, and hold (1) that police were not under an obligation to release Pabon after the x-rays; (2) that suppression is not, in this case, an appropriate remedy for failure to comply with the 48-hour rule established by *McLaughlin* because such failure was not the cause of the officers' discovery that Pabon was, in fact, body-packing narcotics, and (3) applying the framework established in *McLaughlin*, that the evidence adduced by Pabon does not reveal that the police unreasonably delayed his *Gerstein* hearing. As a result, suppression is not warranted and, accordingly, the judgment of the district court is AFFIRMED.

| | |
|---|---|
| FOR DEFENDANT-APPELLANT: | BARCLAY T. JOHNSON, Burlington, Vermont, *for Michael L. Desautels*, Federal Public Defender for the District of Vermont, Burlington, VT. |
| FOR APPELLEE: | JOSEPH R. PERELLA (Gregory L. Waples, on the brief), *for Eugenia A.P. Cowles*, Acting United States Attorney for the District of Vermont, Burlington, VT. |

DEBRA ANN LIVINGSTON, *Circuit Judge*:

In the early hours of March 21, 2014, Vermont state police pulled over the car in which defendant-appellant Roberto Pabon was riding after the driver committed a traffic violation. Acting on corroborated information suggesting

that the driver of the car used that specific route to transport associates who were body-packing drugs, and on specific indications that Pabon was carrying narcotics, the police placed Pabon under arrest. After a CT scan administered that evening pursuant to a search warrant further confirmed the officers' initial assessment that Pabon was body-packing narcotics, Pabon agreed to take laxatives and, over the next several days, he passed packages containing nearly one hundred grams of cocaine and heroin.

Before the district court, Pabon moved to suppress this evidence, and he renews several of his key contentions from this motion on appeal. First, Pabon points to an x-ray exam conducted prior to the CT scan, which, as reviewing doctors explained at the time, did not reveal evidence of body-packing. He contends that probable cause dissipated after the doctors shared this assessment with the state police officers who had arrested Pabon, and that the Fourth Amendment therefore required his immediate release. Second, Pabon argues that the state police failed to timely obtain the judicial determination of probable cause to arrest required under *Gerstein v. Pugh*, 420 U.S. 103 (1975), and *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991). Specifically, he maintains that (1) since the state court judge did not make an affirmative determination of probable

cause for his continued detention until about 4:00 P.M. on March 23, his detention extended beyond the 48 hours within which the *Gerstein* determination generally must be made, and (2) the officers' failure to obtain a probable cause determination at an earlier point in the process amounted to an "unreasonable delay" of that determination, in violation of the Fourth Amendment, under the framework *McLaughlin* provides for analyzing such claims. Any one of these errors, Pabon contends, is sufficient to warrant suppression.

We reject each of Pabon's arguments. Throughout Pabon's detention, and based on the totality of the circumstances they confronted, police had probable cause to believe that he had committed – indeed, that he was committing – narcotics offenses. Thus, even assuming *arguendo* that the Fourth Amendment required the police, after the x-ray exam, to revisit their initial, and correct, determination that they possessed probable cause to arrest, Pabon's continued detention was lawful, subject to the Fourth Amendment framework regulating the warrantless detention of an individual in police custody set out in *Gerstein* and *McLaughlin*.

Turning to Pabon's contentions under those cases, we hold first that even if the officers did violate *McLaughlin*'s 48-hour rule, suppression would not be

4

justified. Because the evidence Pabon seeks to have suppressed was obtained well within the close of the 48-hour window, violation of *McLaughlin*'s bright-line rule cannot have been the cause of the discovery of the evidence at issue, and hence suppression is not warranted. Second, applying *McLaughlin*'s framework for analyzing whether police activity subsequent to an individual's arrest constitutes "unreasonable delay" in bringing that individual's case before a magistrate,[1] we hold that the evidence adduced by Pabon does not demonstrate, on these facts, that the police unreasonably delayed the determination *Gerstein* and *McLaughlin* require. We therefore affirm the judgment of conviction entered below.

## BACKGROUND

### I. Factual Background

On March 16, 2014, on the Sunday preceding Pabon's arrest, Vermont State Trooper Lewis Hatch pulled over a vehicle driven by Jaiden Paige, in which Pabon was a passenger, and Hatch deployed his canine detection dog, trained to detect narcotics, outside the vehicle. The canine alerted to the car. After several consent searches, both on site and back at the police barracks, state police

---

[1] We use the term "magistrate" throughout the opinion when referring to a judicial officer. *See* BLACK'S LAW DICTIONARY 1094, 1257 (4th ed. 2014).

5

officers discovered $8,575 inside the purse of Emily Degrandi, a third occupant of the vehicle, who told them that half of the money was hers, and half belonged to Pabon. The police canine later alerted to the money in a blind sniff test. The officers ultimately allowed all the occupants of the vehicle to leave, but they seized the money and vouchered it as evidence.

Four days later, on March 20, Hatch received a tip that Paige was planning to rent a car from Green Mountain Car Rental ("Green Mountain") in Rutland, Vermont. By this time, Hatch had been informed by the Vermont State Police drug task force that Paige was a suspected narcotics trafficker. According to information the task force provided, Paige frequently ferried narcotics north from Hartford, Connecticut to Rutland, a round-trip distance of over 300 miles, by driving north on Interstate 91 and then northwest on Vermont State Route 103 ("Route 103"). He frequently would not carry the narcotics himself, according to the task force's information, but would instead have an associate body-pack the drugs for the duration of the drive.

Hatch followed up on the Paige tip by contacting Green Mountain directly and inquiring into Paige's rental history. Hatch was advised that Paige had rented from Green Mountain several times in the past, that he would frequently

6

rent a vehicle in the afternoon and return it early the next morning, and that he would generally put hundreds of miles on the vehicle in the interim. Hatch also confirmed that Paige was scheduled to rent a vehicle that evening and Hatch obtained the make, model, and license number of that automobile.

Hatch also investigated Paige's traffic stop and accident history, which corroborated the information provided by the drug task force. This history showed that Paige had been involved in a number of incidents along Interstate 91 and Route 103 between Hartford and Rutland, and that nearly all these incidents occurred between 8:00 P.M. and 2:00 A.M. More specifically, most of the stops and accidents in the evening occurred while Paige was driving southward, and most of those that occurred in the very early morning took place while Paige was driving northward.

Armed with this information, Hatch monitored Green Mountain over the course of that afternoon. At approximately 4:45 P.M., Hatch observed Paige entering Green Mountain. Soon thereafter, drug task force personnel informed Hatch that the vehicle Paige was scheduled to rent was parked where Paige had earlier told Hatch that he lived; by late evening the drug task force indicated that the car was no longer there. Hatch immediately emailed other local law

enforcement to share the information he had gathered, and to inform them that it was possible Paige would be making what appeared to be his regular run into Vermont from the Hartford area later that night.

At about 12:42 A.M. the next day – Friday, March 21 – Trooper Seth Richardson spotted the vehicle Hatch had identified in his email heading northwest on Route 103 in Vermont. At 12:48 A.M., after Richardson had trailed the car for several miles, first along Route 103 and then north on U.S. Route 7 towards Rutland, Richardson pulled the vehicle over for failing to come to a complete stop at a stop line in Rutland. Paige was operating the vehicle, and Pabon was in the passenger seat. While Paige provided his license and registration at Richardson's request, Pabon refused to identify himself.

In response to questioning from Richardson, Paige claimed that he had been driving north on U.S. Route 7 from a town several miles to the south on the same road. When Richardson informed Paige that he had seen Paige turn onto U.S. Route 7 from Route 103, Paige denied having done so. Paige subsequently consented to a search of his rental vehicle, and both he and Pabon stepped out of the vehicle to allow Richardson, together with several officers from the Rutland Police Department who had joined him, to conduct the search. The officers did

8

not immediately locate anything of interest in the vehicle, and both Paige and Pabon were permitted to reenter the car while the officers conducted a canine sniff of the vehicle's exterior. The canine alerted on the exterior of the passenger-side front door of the vehicle, inside of which Pabon was seated. Given the canine alert, the officers asked Pabon and Paige to exit the vehicle again, placed each in a separate police cruiser, and escorted them to the state police barracks in Rutland.

Once at the barracks, the officers asked Pabon and Paige to consent to searches of their person. Paige granted consent, but the search revealed nothing of interest. Further, when Trooper Hatch brought his canine into the search room to conduct a sniff of the chair on which Paige had been sitting, the canine did not alert to the chair. Paige was accordingly released soon thereafter.

Pabon, on the other hand, refused to give the officers a clear answer as to whether or not he would consent to a search of his person. Instead, after first equivocating as to whether officers could search his jacket, Pabon became agitated and suddenly removed all of his clothing without having been asked to do so. The officers did not conduct a search of Pabon's person or his clothing at that time, though they did ask Pabon to sit on a chair in another room so that

9

they could conduct a canine sniff. Pabon vehemently refused to sit down, becoming confrontational to the point that he was returned to his holding cell for safety reasons.

After being returned to his cell, Pabon urgently asked to use the bathroom, threatening to urinate on the floor (and even removing his penis from his pants to do so) if he was not immediately taken to the facilities. The officer supervising Pabon told Pabon that he would return shortly to escort Pabon to the bathroom, but that he would first need to ensure that the water flow to the toilet was turned off. Pabon agreed to wait. When the officer returned, however, Pabon denied that he needed to use the bathroom and merely asked the officer for some water. Hours later, Pabon had still not required use of the facilities.

While Pabon was being held, Hatch sought two search warrants from Judge William Cohen of the Vermont Superior Court: one permitting the officers to conduct a more thorough search of Paige's rental vehicle, and one permitting both a search of Pabon's person and clothing and the x-ray of his lower abdomen. Judge Cohen issued both warrants at 7:50 A.M. on the morning of March 21. By this time, about seven hours had elapsed since the initial stop of the car in which Pabon was a passenger.

State police officers promptly conducted the searches Judge Cohen had authorized. In the course of searching the vehicle, the officers discovered and seized three cell phones. In addition, a canine sniff produced alerts on the passenger-side door, the cushion on the front passenger-side seat (where Pabon had been sitting), and the floorboard beneath the driver's-side seat. The search of Pabon's person, however, revealed nothing of interest.

After Pabon left for the Rutland Hospital with several officers for his x-ray, Hatch conducted a canine sniff of the cell in which Pabon had been held. The dog circled inside the holding cell several times and then issued what Hatch identified as an alert to the odor of narcotics.

At the Rutland Hospital, Pabon was asked by hospital staff to provide a urine sample. A police officer escorted Pabon into the restroom and told him that, when he was finished providing the sample, he could urinate into, but should not flush, the toilet. Pabon subsequently sat on the toilet, informing the officer that he needed to defecate. He was again advised that he could not flush as the police suspected that he was body-packing. Contrary to instructions, Pabon abruptly turned as if adjusting his handcuffs and flushed or attempted to

flush the toilet, but the police who quickly responded did not observe anything in it.

Pabon's x-rays were then taken and examined by two doctors at the hospital: a radiologist and the emergency room attending physician who had admitted Pabon. The images revealed several shaded masses in Pabon's pelvic area. In a written evaluation, Dr. James Rademacher, the radiologist, concluded that this x-ray did not provide specific "evidence [of] a foreign body" or of any "rectal foreign body." Joint App'x 161. Dr. Rademacher explained to the officers that, while he "did see several quite rounded structures in the rectum," the x-ray did not show "any foreign bodies [or] foreign material in the rectum consistent with drug-packing," and that the "rounded structures" visible in the image were "most likely . . . very hard stool balls." *Id.* at 170. Dr. Todd Gregory, the emergency room physician, likewise reported in a separate evaluation that the "x-rays [we]re negative," and that it was therefore "unlikely" that Pabon was body-packing. *Id.* at 82.

Dr. Rademacher also explained to the officers in conversation, however, that an x-ray exam is not necessarily a test that is "all that sensitive . . . [or] that specific" for uncovering evidence of body-packing. *Id.* at 170. Because an

x-ray works, in part, by revealing differences between the densities of objects captured in the image, and because the density of packed narcotics can be similar to that of biological material, Dr. Rademacher explained that it was certainly "possible that there could be some type of rectal packing . . . not" identifiable in the x-ray image. *Id.* at 171. As he put it, he saw no "positive evidence for a foreign body within the rectum," but that while positive evidence would be "highly specific" on this point, the absence of such evidence "does not mean [the foreign body] does not exist." *Id.* at 170-71.

The hospital discharged Pabon into the custody of the state police just after 2:30 P.M., under fourteen hours since the stop of Paige's car. Upon Pabon's return to the police barracks, Hatch began to draft an application for an additional search warrant permitting the officers to bring Pabon back to the hospital for a CT scan, which would be more reliable. In the interim, one of Hatch's on-site superiors, Sergeant Mark Perkins, emailed a copy of the x-ray images to Sergeant Eric Albright, who had worked in drug interdiction for about 16 years and, in that capacity, had reviewed x-rays of suspected body packers on over a dozen occasions.[2] Examining the images, Albright "immediately

---

[2] Albright had served as an EMT before becoming a state trooper. At the time of the events at issue in this case, he was assigned to the traffic operations unit.

observed three masses in the lower pelvis area," a presentation "consistent with other x-rays [he had] observed" in several body-packing cases he had worked on. *Id.* at 73. Albright completed an affidavit documenting his assessment, which Hatch then incorporated into the larger affidavit he had prepared in support of the CT scan search warrant application.

Meanwhile, Pabon remained in a holding cell in the police barracks. At about 4:15 P.M., less than two hours after his discharge from the Rutland Hospital, he banged his head on the cell doors and appeared to injure himself. The officers tending to him decided to take Pabon back to the hospital for examination and possible treatment, notifying Hatch of the situation. Hatch completed the warrant application shortly thereafter – likely before 5:00 P.M. While he immediately sought its approval from a state court judge, he was at first unable to reach one.

Back at the hospital, Pabon was evaluated by Dr. John Hartmann at about 5:10 P.M. Pabon complained of lethargy and Dr. Hartmann noted that Pabon, on examination, appeared to be lethargic. After being informed by the officers on scene that Pabon was suspected of body-packing, Dr. Hartmann reviewed the x-ray images taken earlier in the day and found them to be "equivocal" on the

14

question of whether Pabon was body-packing. *Id.* at 80. Out of concern that Pabon might actually be body-packing, and specifically that a punctured narcotics bag could be causing Pabon's lethargy and posing a risk of harm, Dr. Hartmann ordered a CT scan, at which point, according to Dr. Hartmann, Pabon "became suddenly and acutely alert," repeatedly and vociferously refusing to have the scan performed. Pabon was discharged from the hospital at about 6:15 P.M. with a diagnosis of "lethargy, resolved."

By this time, Hatch had spoken to Judge Cohen, though the precise time is not clear from the record. Judge Cohen, pointing to the fact that Dr. Rademacher's and Dr. Gregory's written assessments indicated that the x-rays did not reveal evidence of body-packing, had declined to issue the warrant for a CT scan. Informed of the most recent developments at the hospital, however, Hatch soon secured an affidavit from Dr. Hartmann attesting to his interaction with Pabon, his view that the x-ray images were "equivocal for foreign body in the patient's rectum," and his recommendation that a CT scan be performed. Hatch then revised his own affidavit accordingly and resubmitted the application for a CT scan search warrant to Judge Cohen. At 9:15 P.M., or just

15

over 20 hours since the car in which Pabon was riding was stopped, Judge Cohen issued the requested warrant.

Pabon underwent a CT scan soon thereafter. The CT scan images revealed multiple rounded densities in the rectum suggestive of body-packing. Pabon was approached by medical personnel and, on their advice, he agreed to ingest oral laxatives. Sometime after midnight, just over 24 hours after he was initially detained, Pabon passed three packages containing narcotics. Pabon continued to pass packages over the next several days. In total, police recovered eight packages from Pabon containing, together, nearly 100 grams of cocaine and heroin.

On March 23, at about 4:00 P.M., Hatch contacted Judge Cohen to obtain a determination that the state police had probable cause to detain Pabon. Judge Cohen so found, and set bail at $500,000. Arraignment – the first time Pabon appeared before a judicial officer – was held on March 26 before Judge Theresa DiMauro. Bond was re-set at $250,000, and Pabon entered a plea of not guilty.

## II.  Procedural History

Following the dismissal of state charges in favor of federal prosecution, Pabon was indicted in the District of Vermont on one charge of possession with

16

intent to distribute cocaine and heroin. Pabon thereafter filed a motion to suppress physical evidence obtained after his arrest with the district court (Murtha, *J.*). As relevant here, Pabon argued that suppression was warranted because probable cause dissipated after doctors determined his x-rays did not reveal any foreign material and that, therefore, the state police were required to release him immediately upon discharge from the hospital. Pabon also argued that suppression was warranted because the state police had violated the Fourth Amendment rule set forth in *Gerstein* and *McLaughlin*, by not securing a prompt judicial determination of probable cause to detain after his warrantless arrest.

After a suppression hearing at which Hatch and Dr. Rademacher, among others, testified, the district court denied Pabon's motion, concluding that the officers had not violated Pabon's Fourth Amendment rights. Pabon and the Government subsequently entered into a plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) in which they agreed upon a sentence of 30 months, at the low end of Pabon's applicable Sentencing Guidelines range. The plea agreement also preserved Pabon's right to appeal the district court's ruling on his motion to suppress. The court accepted the plea agreement and

17

sentenced Pabon principally to 30 months' imprisonment.[3]   This appeal timely

followed.

## DISCUSSION

In adjudicating the merits of this appeal, we review the district court's

factual findings for clear error, and its application of law to fact *de novo*.   *See*

*United States v. Bohannon*, 824 F.3d 242, 247–48 (2d Cir. 2016).   We may affirm

the district court's judgment on a motion to suppress "on any ground that finds

support in the record."   *United States v. Ganias*, 824 F.3d 199, 208 (2d Cir. 2016)

(en banc).

Though we have previously expressed some doubt about whether, in

conducting our review, we "view the evidence in the light most favorable to the

prevailing party [on the motion to suppress] or . . . simply review for clear error,"

*United States v. Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015), we clarify here that,

in reviewing the district court's decision, we apply familiar standards governing

clear error review, without viewing the evidence in either party's favor.   In

addition to carrying with it the advantage of invoking already-familiar standards

of review, this approach is also the one most consistent with precedent.

---

[3] Pabon has now completed the 30-month term of incarceration ordered by the district court.

In *Ornelas v. United States*, 517 U.S. 690 (1996), the Supreme Court, in holding "that as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal," also made clear that we review a district court's findings of fact underlying such determinations "only for clear error."[4]  *Id.* at 699.  The Court in *Ornelas* nowhere suggested that the clear error standard should be slanted in favor of one party or another, moreover, but instead suggested that it intended for us to apply the familiar version of that standard.   As the Court explained, "'[c]lear error' is a term of art derived from Rule 52(a) of the Federal Rules of Civil Procedure, [which] applies when reviewing questions of fact."   *Id.* at 694 n.3.   The Court nowhere indicated that this "term of art" takes on a different meaning when invoked in the context of the appeal from a motion to suppress.

---

[4] *Illinois v. Gates* had earlier held, in the context of warrants, that an issuing magistrate's probable cause determination is not reviewed *de novo*, but should be upheld so long as "the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing."  *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)); *see also Walczyk v. Rio*, 496 F.3d 139, 157, 158-59 (2d Cir. 2007) (applying same standard to arrest warrant). Pabon's Fourth Amendment challenges are not principally directed at the probable cause supporting either of the two search warrants that issued during his detention, and we do not address the standard of review in the context of searches or arrests pursuant to warrant.

As to the alternative approach, namely viewing the evidence in the light most favorable to the prevailing party, this standard makes little sense, given the Supreme Court's admonition in *Ornelas* that we should also give "due weight" to the inferences drawn by local law enforcement officers and by trial judges, who are resident in the communities they serve. *Ornelas*, 517 U.S. at 699; *United States v. Wilson*, 699 F.3d 235, 242 (2d Cir. 2012). A reviewing court should "review findings of historical fact only for clear error," the Court said, "giv[ing] due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas*, 517 U.S. at 699. But employing the alternative approach, it is far from clear how one might go about appropriately layering the inferences required by this approach on top of the "due weight" afforded by *Ornelas* to locally-drawn inferences.

As a result, as *Bershchansky* itself recognized, "the better approach is to review the district court's findings of fact for clear error without viewing the evidence in favor of either party." 788 F.3d at 109. While we have not, in cases since *Bershchansky*, definitively resolved the question that case left open, this "better approach" is the one we have consistently invoked. *See, e.g.*, *Bohannon*, 824 F.3d at 247–48. And, of particular note, this is the standard we recently

20

applied when sitting as an *en banc* court in *Ganias*. 824 F.3d at 208. We therefore decline to view the evidence in the Government's favor in the context of this challenge to Pabon's warrantless detention, and instead simply apply the clear error standard.

## I

An officer has probable cause to arrest where he is in possession of "reasonably trustworthy information [concerning] facts and circumstances sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (internal quotation marks omitted). This standard "is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal quotation marks omitted). "Because the standard is fluid and contextual, a court must examine the totality of the circumstances [surrounding] a given arrest." *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008). In doing so, we consider the circumstances from the perspective of an objectively reasonable police officer, recognizing that the officer is entitled to draw

reasonable inferences on the basis of his prior experience. *Id.*; *see also Ornelas*, 517 U.S. at 700.

Pabon does not vigorously contest on appeal that the Vermont state police had probable cause to arrest him following the early morning March 21, 2014 traffic stop. At the time of that arrest, the police were acting on the basis of specific information: (1) that Paige, a known drug dealer, had been scheduled to rent a car the prior evening; (2) that Paige had a history of nighttime drug runs, ferrying drugs north on Interstate 91 and northwest on Route 103, from Hartford to Rutland; (3) that the contraband carried on these nighttime runs was frequently transported by an associate (in this case, Pabon) who would body-pack the drugs; (4) that Paige often rented a car for these long overnight drives from the very car rental outlet he rented from the prior evening; (5) that Paige had a history of evening and early morning traffic stops and accidents along this defined route between Hartford and Rutland; (6) that Paige was seen driving along Route 103 that evening, but denied having been on it; (7) that earlier that same week Pabon had been in the car with Paige when a trained canine alerted to the car and to money suspected of being drug-sale proceeds; and (8) that a canine also alerted on the front passenger side of the vehicle, where

Pabon was seated, on the very night of his arrest. Given the totality of circumstances – and in light of "the events leading up to the arrest," *Pringle*, 540 U.S. at 371 – the officers had probable cause to arrest Pabon.

Pabon's chief contention is that after the initial arrest and, in particular, after the assessments by Drs. Rademacher and Gregory that the x-ray images taken pursuant to the first search warrant did not reveal evidence of body-packing, probable cause had "dissipated." Pabon Br. 24. As a result, Pabon argues, he should have been released from police custody as soon as he was returned to the police barracks from the hospital, if not before. The failure to release him, he contends, warrants suppression of all the evidence that followed. For the following reasons, we disagree.

****

We appear to have first discussed the effect of a dissipation of probable cause on the legality of a search or seizure in *United States v. Marin-Buitrago*, 734 F.2d 889 (2d Cir. 1984). There, we observed that officers charged with executing a warrant have a "duty to report new or correcting information to the magistrate" if information received after the warrant has been signed, but before its execution, would be "material to the magistrate's determination of probable

cause" – in other words, would "cast doubt on the existence of probable cause." *Id.* at 894-95. Though *Marin-Buitrago* dealt with the standards for issuance of a search warrant, the same logic applies in evaluating whether probable cause exists for a warrantless arrest. *See Walczyk*, 496 F.3d at 156 (applying the standards governing probable cause for a warrantless arrest to evaluate probable cause for issuance of a warrant). As the Fifth Circuit explained in the context of a warrantless seizure of property, it is "a corollary . . . of the rule that the police may rely on the totality of facts available to them in establishing probable cause" that officers "may not disregard facts tending to dissipate probable cause" when directly confronted with such facts before an arrest is made. *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988); *see also Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("[A]n officer may not disregard plainly exculpatory evidence."); *Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003) ("[U]nder some circumstances, a police officer's awareness of the facts supporting a defense can eliminate probable cause.").

We have not often considered dissipation in the context of new information emerging *after* a warrantless arrest based on probable cause. The core obligation the Fourth Amendment imposes on the police at this stage is to

24

ensure that "persons arrested without a warrant . . . promptly be brought before a neutral magistrate for a judicial determination of probable cause." *McLaughlin*, 500 U.S. at 53; *see also Manuel v. City of Joliet*, 137 S. Ct. 911, 917–18 (2017) (explaining that, after an arrest, the focus of the Fourth Amendment's guarantee to individuals detained without a warrant is on ensuring that the detainee receives a "fair and reliable determination of probable cause as a condition for [imposing] any significant pretrial restraint" (quoting *Gerstein*, 420 U.S. at 125)). It is then the *magistrate's* job to determine "whether there is probable cause for detaining the arrested person pending further proceedings."[5] *Gerstein*, 420 U.S. at 120.

---

[5] This understanding is embedded in our § 1983 case law. We have explained that the probable-cause-to-arrest inquiry is generally "limited to whether the facts known by the arresting officer at the time of the arrest objectively provide[] probable cause to arrest." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (internal quotation marks omitted); *see also Warren v. Dwyer*, 906 F.2d 70, 73 (2d Cir. 1990) ("[P]robable cause encompasses only that information available to the arresting official prior to and including the point of seizure."). A § 1983 plaintiff's false arrest claim therefore fails so long as the officer had probable cause to arrest at the time the arrest was made, even if information later developed that would undermine probable cause. *See Caldarola v. Calabrese*, 298 F.3d 156, 166 (2d Cir. 2002) (examining whether the officer's decision to arrest was reasonable "based on the information available to him at the time"). Thus, "[o]ur court has uniformly rejected Fourth Amendment false arrest claims premised on lawful arrests supported by probable cause." *See Russo v. City of Bridgeport*, 479 F.3d 196, 204 (2d Cir. 2007).

Consistent with this approach, cases from other circuits concerning the "dissipation" of probable cause generally address the question whether, when an officer receives information that directly undermines probable cause *prior* to an arrest, he must

Other than the obligations clearly imposed by *Gerstein* and *McLaughlin*, the Supreme Court has never indicated that the police have a specific Fourth Amendment obligation in the aftermath of a warrantless arrest continually to reevaluate whether the available evidence still definitively supports the initial probable cause determination. Some sister circuits, moreover, have suggested that the administration of an obligation "to release suspects the moment sufficiently exculpatory evidence emerges" would be unmanageable. *See Peet v. City of Detroit*, 502 F.3d 557, 565 (6th Cir. 2007); *Brady v. Dill*, 187 F.3d 104, 111–12 (1st Cir. 1999). In the often crucial hours after an arrest, the police and other law enforcement officers may be required to trace multiple developing leads at any given time, with each new piece of information supporting probable cause, or sometimes running counter to it. Given the fluidity purposely built into the probable cause standard, requiring officers continually to make moment-to-moment assessments of probable cause could misallocate limited

account for this information in deciding whether probable cause to arrest is present. *See, e.g., Seiser v. City of Chicago*, 762 F.3d 647, 655–56 (7th Cir. 2014) (considering and rejecting the contention that passing a field sobriety test prior to arrest negated probable cause); *Stonecipher v. Valles*, 759 F.3d 1134, 1146 (10th Cir. 2014) (evaluating the merits of a false arrest claim by looking to the officers' reasonable interpretation of the information known at the time of arrest); *Evett v. Denteff*, 330 F.3d 681, 688 (5th Cir. 2003) (evaluating whether probable cause had dissipated "based on all of the available information at the time of the arrest").

police resources and even undermine the framework established in *Gerstein* and *McLaughlin*, which provides for a prompt determination by a *magistrate* whether probable cause exists "as a prerequisite to extended restraint of liberty following arrest." 420 U.S. at 114; *see Peet*, 502 F.3d at 565 (noting that a "court-imposed requirement" of ongoing revaluation of probable cause could result in "[s]ome released suspects [being] rearrested when further inculpatory evidence emerged," even multiple times).

We need not decide, however, whether an officer may, in an extreme case, be required to release a detainee arrested without a warrant where probable cause has unequivocally dissipated, rendering further detention prior to the magistrate's determination unreasonable. *Cf. Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (suggesting a § 1983 malicious prosecution claim may lie where an officer affirmatively continues processing a defendant's case after the "groundless nature of the charges" has become "apparent"). This case does not present this question, as it is clear from an assessment of the record that police at all times possessed a reasonable basis for concluding that Pabon had committed – indeed, was committing – a crime.

As discussed above, probable cause grounded the initial decision to detain Pabon. In the hours after his arrest, moreover, Pabon's behavior (including the sudden removal of his clothes, and his peculiar conduct on two separate occasions regarding his use – or decision not to use – the restroom) only supported the officers' initial probable cause assessment. Additional evidence emerged from several canine sniffs conducted over the course of that morning. While Pabon was at the hospital, officers at the barracks conducted both a search and canine sniff of the car Pabon had been riding in (pursuant to a warrant issued by the state court judge), and a canine sniff of the holding cell where Pabon had been detained. During a canine sniff accompanying the search of the vehicle, the canine alerted on the passenger seat where Pabon had been sitting. Hatch also conducted a canine sniff of Pabon's holding cell, at the end of which the dog, according to Hatch, alerted to the presence of an odor of narcotics.[6]

Pabon argues that probable cause dissipated "after the x-rays were negative and showed 'no abnormal masses' or 'evidence for a rectal foreign body.'" Br. 20. But he fails to consider the written assessments filed by Drs.

---

[6] Though Pabon contests the accuracy of Hatch's assessment of the alert, the district court credited Hatch's testimony at the suppression hearing that the alert was consistent with the behavior the dog was trained to demonstrate upon scenting the presence of narcotics, and we cannot say that determination was clearly erroneous.

Rademacher and Gregory in light of Dr. Rademacher's testimony at the suppression hearing and the record as a whole. While the doctors' written assessments reflected their view that the x-ray images did not reveal positive evidence of any foreign objects in Pabon's system, Dr. Rademacher's verbal statements to the officers at the time qualified this appraisal, highlighting the limitations of x-rays as a tool for detecting evidence of body-packing. As Dr. Rademacher elaborated in his testimony, an x-ray image will not necessarily capture evidence of body-packing even if someone is carrying narcotics. Because the x-ray works, in part, by revealing relative densities of objects in the human body, and because narcotics can have densities similar to organic material, narcotics in the rectum are not always easily distinguishable in an x-ray image. It was therefore sufficiently clear to the officers at the hospital, including Hatch, that though an x-ray is a "reasonably sensitive" test, Dr. Rademacher's assessment that the image did not reveal the presence of narcotics "[did] not mean that [they] [did] not exist."[7] Joint App'x 171. It was therefore a distinct

---

[7] As Dr. Rademacher later confirmed to investigators from the Vermont state police drug task force, after reviewing the x-ray neither he nor the emergency room attending physician were able to rule out the possibility that Pabon had, in fact, placed something in his rectum. When asked, at the suppression hearing, why he had not

possibility that the variations in image density Dr. Rademacher initially believed to be "very hard stool balls," *id.* at 170, would, on further examination, prove to be narcotics packed inside Pabon's rectum.

In such circumstances, the probable cause to believe that Pabon was transporting narcotics had not dissipated, even taking into account the x-ray examination results. By the time Pabon was discharged from the hospital, the state police not only had the information they had collected prior to Pabon's arrest, but they were also privy to Pabon's objectively suspicious behavior, canine alerts to places where Pabon was either sitting or had been held, and Dr. Rademacher's explanation of the import of the x-ray images and the relative effectiveness of that search method. The officers continued to have a reasonable basis for detaining Pabon, such that, even assuming *arguendo* that an obligation to release a suspect could, in some circumstances, arise, it did not do so here. Properly framed, the central question in this case is thus the one *Gerstein* and *McLaughlin* require us to ask: whether the state police officers unreasonably delayed obtaining a determination, from a state court judge, that there was

_____

further elaborated on this view in his written assessment, Dr. Rademacher explained that he felt it was unnecessary because he had already conveyed the relevant information to Hatch.

30

probable cause to detain. *See McLaughlin*, 500 U.S. at 56. It is therefore to that question that we now turn.

**II**

Pabon next argues for suppression on the grounds that he did not receive a timely post-arrest determination of probable cause as guaranteed by the Fourth Amendment. There are two components of this argument, paralleling the two aspects of *Gerstein*'s Fourth Amendment rule as later articulated by the Supreme Court in *McLaughlin*.

First, in *McLaughlin*, the Court clarified the timeframe within which the probable cause determination required under *Gerstein* must be made. In an effort to "more clearly articulate the boundaries of what is permissible under the Fourth Amendment," the Court explained that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *Id.* at 56. Where a jurisdiction sets and hews to such a rule, the "jurisdiction[] will be immune from systemic challenges" to its compliance with *Gerstein*'s mandate. *Id.* At the same time, if "an arrested individual does not receive a probable cause determination within 48 hours . . . the burden shifts to the government to

demonstrate the existence of a bona fide emergency or other extraordinary circumstance" justifying the delay. *Id.* at 57.

Compliance with this rule, however, does not guarantee "that the probable cause determination in a *particular* case passes constitutional muster simply because it is provided within 48 hours." *Id.* at 56 (emphasis added). Indeed, such timing "may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably." *Id.* Examples of such delay include "delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Id.*

Pabon argues, first, that he was not provided with a probable cause determination within 48 hours, in violation of *McLaughlin*'s general rule. Second, Pabon argues that even if there was no violation of *McLaughlin*'s general rule, the state police unreasonably delayed his probable cause hearing by using the time after his return from the hospital in the wake of his x-ray exam to gather evidence in support of his continued detention. We consider each of these arguments in turn.

### A. *McLaughlin*'s 48-Hour Rule

Pabon first argues that the evidence the state police recovered – including, as relevant here, the CT scan results and the packages of narcotics he passed thereafter – should have been suppressed because the Vermont state police failed to obtain a determination that there was probable cause to detain him until about 63 hours after his arrest, in violation of their Fourth Amendment duties under *McLaughlin*. Neither the Supreme Court nor this Court has yet determined whether a violation of *McLaughlin*'s 48-hour rule is an appropriate basis for suppression. *See Powell v. Nevada*, 511 U.S. 79, 84-85 (1994). However, we need not do so here. Even assuming the general availability of suppression as a remedy in this context, we conclude that, since the bulk (if not all) of the evidence Pabon seeks to suppress was discovered well within the relevant 48-hour period, there is an insufficient causal link between the technical *McLaughlin* violation and the evidence Pabon seeks to have suppressed, and suppression is therefore not warranted in this case.

Pabon was arrested at around 1:00 A.M. on the morning of March 21, 2014, and, as the Government concedes, the state police did not obtain a determination

33

of probable cause to detain from a state court judge until 4:00 P.M. on March 23.[8]

The Government contends that there was nevertheless no violation of *McLaughlin*'s 48-hour rule because Judge Cohen's earlier determinations as to probable cause for the searches of Pabon's person by x-ray and CT scan qualify as judicial determinations of probable cause to detain under *Gerstein*. While we address (and reject) this argument below, it is unnecessary to do so in the context of our discussion here. Because the relevant evidence – the CT scan and the bags of narcotics passed by Pabon thereafter – was first obtained during the first 24 hours after Pabon's arrest (well before 48 hours had elapsed), there is no conceivable causal chain connecting the violation of *McLaughlin*'s 48-hour rule and the discovery of this evidence. As a result, even if police delay in obtaining a probable cause determination violated this component of *McLaughlin*, suppression would not be warranted.

The Supreme Court has long held "but-for" causation to be an irreducible baseline requirement before a court may even begin to consider whether the

---

[8] Pabon's state court record suggests that a state court judge in fact made a determination of probable cause earlier on March 23. However, this determination would still have been made outside of *McLaughlin*'s 48-hour window and therefore would not change the issue presented on appeal. In any case, to the extent that this earlier determination was made within the 48-hour window, the Government does not press the argument and it is therefore waived.

remedy of suppression is justified on the specific facts of a case. "But-for causality is . . . a necessary, [but] not a sufficient, condition for suppression." *Hudson v. Michigan*, 547 U.S. 586, 592 (2006). Thus, a violation of *McLaughlin*'s 48-hour rule cannot justify suppression unless the evidence at issue was, at a minimum, discovered *after* the relevant period had passed.[9]  *See United States v. Crews*, 445 U.S. 463, 471 (1980) (suppression analysis generally "begin[s] with the premise that the challenged evidence is in some sense the product of illegal government activity"). Moreover, a "but-for cause, or causation in the logical sense alone, can be too attenuated to justify exclusion." *Hudson*, 547 U.S. at 592 (internal quotation marks and citation omitted). And "[q]uite apart from the requirement of unattenuated causation, the exclusionary rule has never been applied except 'where its deterrence benefits outweigh its substantial social costs.'" *Id.* at 594 (quoting *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998)).

---

[9] As but one example, in *Powell*, 511 U.S. at 81, 84-85, the Supreme Court, while declining to reach the question whether a violation of the 48-hour rule can ever justify suppression of the evidence realized as a result, considered a case in which a defendant's confession was obtained on the fourth day after his arrest, well past *McLaughlin*'s 48-hour window.

Further, Pabon himself seems to acknowledge the requirement of causation. *See* Br. 39 ("The proper remedy for a violation of the *McLaughlin* rule is suppression of evidence seized or statements made after the point at which the hearing should have been held.").

Here, by the time the 48-hour window had elapsed, the state police already had in their possession much, if not all, of the evidence Pabon now seeks to have suppressed. Pabon began passing packages containing narcotics approximately 24 hours after he was initially detained, well within the 48-hour window. The fact that the state police permitted that period to pass without obtaining a determination of probable cause therefore cannot have caused their discovery of this evidence. It is possible that, since some of the bags of drugs took several days to pass through his alimentary canal, some bags remained inside Pabon past the 48-hour mark and were then passed within the period before (as opposed to after) the judicial determination of probable cause to detain. But this is not a ground for suppression. For one thing, Pabon does not contend that this hypothetical possibility actually occurred or otherwise argue this point. In any event, there is no question that Pabon began passing packages of narcotics within the first 48 hours of arrest and that his subsequent passage of additional packages while remaining detained at the hospital was not in any sense the result of a *Gerstein* violation. Any causation was therefore attenuated and suppression would not serve a net social benefit. As a result, suppression of

this evidence on the grounds that the state police officers violated *McLaughlin*'s 48-hour rule is not warranted.

## B.     *Gerstein*, *McLaughlin*, and "Unreasonable Delay"

Pabon's second argument presents a closer question.   He contends that, upon his initial discharge from the hospital, it was clear to the state police that the available evidence was not sufficient for probable cause to detain, and that they therefore improperly delayed seeking a determination of probable cause while they sought further evidence in support of the arrest.   Accordingly, Pabon argues, because the state police used this delay "for the purpose of gathering additional evidence" to ground their probable cause to arrest, their actions violated *Gerstein*'s mandate that he be provided with a "prompt[]" judicial determination of probable cause.   *McLaughlin*, 500 U.S. at 56.   Pabon further argues that, as a result, suppression is warranted.   On the facts of this case, we disagree with Pabon's first contention, and hence we need not reach the second.

### 1.     The Status of the Probable Cause to Search Determination

As a preliminary matter, we reject the Government's contention (noted in passing above) that Pabon had, by the time he returned from the hospital, *already* received the judicial determination of probable cause required by *Gerstein*.   As the Government points out, Judge Cohen had previously issued the x-ray search

warrant that allowed the police to bring Pabon to the hospital in the first instance. The Government argues that the probable cause determination necessarily made by Judge Cohen in issuing that search warrant amounted to a judicial determination of probable cause to detain qualifying under *Gerstein* as well. Since this warrant issued within seven hours of Pabon's arrest, the accompanying determination would, if so qualifying, undercut any *Gerstein*-based claim arising thereafter.

This argument is unavailing, however, because the determination of probable cause underpinning the x-ray search warrant did not satisfy *Gerstein*.[10]

---

[10] Pabon argues that this determination could not satisfy *Gerstein* because it was made *ex parte*. However, a judicial probable cause determination need not be made with the defendant present in order to satisfy *Gerstein*. As Pabon recognizes, *Gerstein* itself held that "the Constitution does not require an adversary determination of probable cause." 420 U.S. at 123. Pabon offers no justification for his belief that, though the safeguards of an adversary proceeding are *not* necessary, the detainee's presence is still required. Moreover, such a requirement would not make sense within the structure of *Gerstein*, as a *Gerstein* probable cause determination largely takes the place of a pre-arrest warrant determination, at which the target of the investigation is obviously not present. *See Baker v. McCollan*, 443 U.S. 137, 143 (1979) ("A person arrested pursuant to a warrant issued by a magistrate on a showing of probable[] cause is not constitutionally entitled to a separate judicial determination that there is probable cause to detain him pending trial.").

In any case, Pabon's argument is not a viable one. As the Court's analysis in *Powell* shows, the question whether a jurisdiction has complied with *McLaughlin* turns on the timing of the probable cause determination made by the magistrate *without* the individual being detained present, not the subsequent preliminary hearing at which he does appear. *See Powell*, 511 U.S. at 81, 83–84. In fact, this point is so basic that the leading treatise on search and seizure law plainly characterizes the *Gerstein* hearing as

Although the probable cause standard governs both search and arrest, and the same quantum of evidence is necessary to establish either, *see Florida v. Harris*, 568 U.S. 237, 243–44 (2013) (citing precedent on both probable cause to search and probable cause to arrest in articulating the relevant standard for a search); *Zalaski v. City of Hartford*, 723 F.3d 382, 389–90 (2d Cir. 2013) (same, in the context of probable cause to arrest), a determination of probable cause to search is not the same as a determination that there is, at the same time, probable cause to arrest, or vice versa. Though the nature of the inquiry required by the two analyses is the same, the focus of the inquiry is different. The question in a probable cause to search case – whether the available facts "warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present," *Harris*, 568 U.S. at 243 (internal quotation marks and brackets omitted) – becomes, in a probable cause to arrest case, whether the available facts "warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime," *Walczyk*, 496 F.3d at 156

---

an "ex parte probable cause determination." 3 Wayne R. LeFave, Search & Seizure: A Treatise on the Fourth Amendment § 5.1(g) (5th ed. 2012). Thus, if Pabon did receive a timely judicial determination of probable cause, that this determination was made *ex parte* is not problematic under *Gerstein*.

(internal quotation marks omitted). Answering one question does not necessarily resolve the other.

Here, the Government maintains that the determination that probable cause existed to subject Pabon specifically to a search also provided, at the same time, probable cause sufficient to justify holding him for narcotics violations. In the particular circumstances of this case, that may well be true. But the state court judge's determination that probable cause justified the search by x-ray required a different analysis than that demanded by *Gerstein*, and the former cannot serve as a categorical substitute for the latter. (Indeed, in many cases where there may be probable cause to search a home, an office, or even a person for evidence of some crime, there may be little to no reason to believe that the home's occupant, the office worker, or even the individual to be searched was involved in criminal activity.) The judge's determination that probable cause existed to search thus did not displace the state police officers' continuing obligation to comply with *Gerstein*.

### 2. *McLaughlin*'s "Unreasonable Delay" Framework

Because the state court judge's determination of probable cause for the x-ray search cannot stand in for *Gerstein*'s determination of probable cause to detain, *McLaughlin*'s framework remains controlling, and the question becomes

whether, under that framework, Pabon satisfied his burden of "prov[ing] that his . . . probable cause determination was delayed unreasonably." 500 U.S. at 56. For reasons we now explain, we conclude that he did not.

As the Supreme Court has recognized, *Gerstein* represents a "'practical compromise' between the rights of individuals and the realities of law enforcement." *McLaughlin*, 500 U.S. at 53 (quoting *Gerstein*, 420 U.S. at 113). Because "the burden that proliferation of pretrial proceedings places on the criminal justice system" means that "the interests of everyone involved, including those persons who are arrested, might be disserved by introducing further procedural complexity into an already intricate system," the Court "stopped short of holding that jurisdictions [a]re constitutionally compelled to provide a probable cause hearing immediately upon taking a suspect into custody and completing booking procedures." *Id.* Thus, it is *not* the case that *Gerstein* requires "a probable cause determination to be made as soon as the administrative steps incident to arrest [a]re completed." *Id.* at 54 (internal quotation marks and emphasis omitted). Rather, "*Gerstein* struck a balance between competing interests; a proper understanding of the decision is possible only if one takes into account both sides of the equation." *Id.*

41

Even within the 48-hour timeframe, however, a probable cause determination may encroach on a detainee's right to a prompt and neutral determination of probable cause because it is "unreasonably" delayed. *Id.* at 56. Case-specific circumstances may, for example, demonstrate that the *purpose* of a delay is to avoid – even if temporarily – a magistrate's neutral probable cause determination. Delay "for delay's sake," for instance, or "motivated by ill will against the arrested individual," is inconsistent with the Fourth Amendment, and hence violates *Gerstein*. *Id.* at 56–57. In addition, *McLaughlin*'s bright-line rule is not to be used as a license to detain first, and seek justification in the ensuing 48 hours. Thus, unreasonable delay includes "delay[ ] for the purpose of gathering additional evidence to justify the arrest." *Id.* at 56

At the same time, *McLaughlin* does not bar the police from continuing an ongoing investigation while the arrestee is being held and awaiting a probable cause determination. In fact, the practical reality of law enforcement is that an investigation often *will* be ongoing during the pendency of an initial detention – a reality that is ultimately protective of both the defendant's interests in being free from extended seizure (because the investigation may exonerate a detainee) and society's interest in the prompt and efficient investigation of crime. The

period immediately after a seizure can be critical as the police investigate the scene of a crime, take witness statements, evaluate suspects, and assess the quality of potential leads. Such investigative efforts can be essential to developing a careful and detailed picture of the circumstances of a suspected crime, especially because the quality of this information often diminishes rapidly with time. [11] Accordingly, neither *Gerstein*'s "practical compromise," nor *McLaughlin*'s "balance [of] competing interests," demands that all investigative activity cease the moment an arrest is made.

Pabon argues that he established before the district court that there was an unreasonable delay by police in obtaining a magistrate's determination of probable cause to arrest after the x-ray examination failed to produce evidence that he was body-packing narcotics. He contends that at this point, "[i]t is undisputed that the delays were occasioned by Trooper Hatch's efforts to gain additional evidence to justify the arrest." Br. 38. We disagree. Pabon has not shown that the investigation subsequent to his discharge from the hospital was for the purpose of buttressing the officers' probable cause so as to justify the

---

[11] For instance, the accuracy of eyewitness testimony is generally correlated with its temporal proximity to the witnessed events. *See* Brandon L. Garrett, *Eyewitnesses & Exclusion*, 65 Vand. L. Rev. 451, 468–69 (2012).

arrest. Accordingly, he has not demonstrated a Fourth Amendment violation under *McLaughlin* that might, potentially, warrant suppression.

First, as already discussed, the police at all points *had* probable cause to believe that Pabon was transporting narcotics.[12] And given the accumulating evidence, Pabon cannot show, as he must under *McLaughlin*, that the officers' decision to proceed with their investigation while continuing to detain him – and, specifically, their decision to request that Judge Cohen issue a warrant for a CT scan – amounted to unreasonable delay designed to further strengthen the officers' probable cause case. Pabon's evidence shows only that officers took the reasonable next step in seeking the more-detailed CT scan given, as the district court concluded, that "the x-rays were inconclusive." Joint App'x 245. The evidence police had assembled to that point, moreover, fully justified their efforts to obtain the more accurate scan.

Pabon contends that the fact that Judge Cohen initially denied the state police officers' application demonstrates the unreasonableness of the officers' decision to continue to detain him. Pabon's argument is essentially a version of

---

[12] To decide this case, we need not resolve whether continuing probable cause to arrest for the crime to be charged is sufficient to defeat an inference that an ongoing investigation was designed to permit police to buttress their case before a magistrate. At the very least, however, the showing necessary to demonstrate unreasonable delay in such a situation is correspondingly greater.

the same argument made by the Government and discussed above – namely, that a determination as to probable cause to search is equivalent to a determination about probable cause to detain. But the mere fact that Judge Cohen determined in the immediate aftermath of the x-ray procedure that the available evidence did not justify issuing a second search warrant for a CT scan does not, under the circumstances here, support a case for unreasonable delay under *McLaughlin*.

This conclusion stems, again, from the fact that the inquiries into probable cause to search and probable cause to detain are different, and are affected by different considerations, given the Fourth Amendment's "ultimate touchstone" of "reasonableness." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Thus, in determining whether a search warrant for a medical procedure should issue, a magistrate might reasonably conclude that a bodily intrusion "implicates expectations of privacy and security of such magnitude that the intrusion may be 'unreasonable' even if likely to produce evidence of a crime." *Winston v. Lee*, 470 U.S. 753, 759 (1985); *see id.* at 758-61 (holding that surgical intrusion to recover bullet was unreasonable under the Fourth Amendment, based on totality of the circumstances). Here, where the requested search was medical in nature and its scope implicated "significant privacy concerns," *see Birchfield v. North*

45

*Dakota*, 136 S. Ct. 2160, 2178 (2016) (internal quotation mark omitted), the decision not to issue a second search warrant in the immediate aftermath of the x-ray examination simply cannot be equated to a determination that police lacked a reasonable basis to believe that Pabon was engaged in narcotics trafficking and was properly detained.

Other factors, moreover, further support the conclusion that Pabon failed to establish an unreasonable delay in seeking a judicial determination of probable cause for his arrest. As already noted, Pabon was arrested at around 1:00 A.M. The first search warrant was obtained within seven hours, at 7:50 A.M., by officers working in the early morning hours. Similarly, police sought the second search warrant within four hours of Pabon's discharge from the hospital, and the third immediately thereafter, once the new information from Dr. Hartmann emerged.

As already noted, these multiple search warrant applications to Judge Cohen, well within the first 24 hours of arrest, cannot substitute for the requirement that police making a warrantless arrest obtain a prompt determination from a magistrate that probable cause exists to detain. At the same time, these efforts substantially undercut Pabon's claim that police were

46

acting unreasonably to delay a judicial examination into the basis for his detention.   Looked at objectively, and in light of the conclusion that the officers at all times had probable cause to detain Pabon, these applications are instead most consistent with the proposition that officers were acting with dispatch to procure the narcotics – narcotics that would not only be important to a later prosecution (even if unnecessary to show probable cause) but that also posed a health risk to a detainee in their custody.   Particularly where the detainee's own post-arrest behavior was fueling the officers' conviction that he was body-packing drugs, the police conduct here was reasonable, and did not involve unnecessary delay.

In sum, Pabon has not demonstrated that the state police officers unreasonably delayed the probable cause determination that *Gerstein* requires. Police already had sufficient evidence to support his arrest.   When Pabon was discharged from the hospital after his x-ray exam, the state police officers had before them all of the background information grounding probable cause for the initial arrest, plus all of the information that had developed over the course of the day.   Layering this information together, the police reasonably concluded that an application for a CT scan search warrant should follow.   This warrant

47

issued well within 24 hours of Pabon's arrest, and resulted in his consent, upon medical advice, to ingest laxatives so as to remove narcotics from his body that posed a serious health risk to him and that also constituted important evidence. Because Pabon has failed to demonstrate that the reasonable steps undertaken by police after his initial detention were designed to provide the justification for his arrest, his claim under *Gerstein* and *McLaughlin* fails. We accordingly affirm the district court's denial of his motion to suppress the evidence subsequently obtained.

## CONCLUSION

We have considered all of Pabon's remaining arguments and find them to be without merit.[13] For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

[13] Before oral argument was held, Pabon filed a motion to supplement the record on appeal, which was denied without prejudice to renewal before the merits panel. Docket No. 24. Although Pabon did not formally re-file a motion on the docket, he submitted materials and argued the point in his brief. *See* Br. 42-47. Assuming this constituted a renewal of the motion, given our disposition of this appeal and the materials' lack of relevance thereto, the motion is denied as moot.